UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| WALTER FONTROY, | |
| Plaintiff, | |
| v. | Civil Action No: 16-1741 (TFH) |
| GOVERNMENT OF THE DISTRICT OF COLUMBIA, et al. | |
| Defendants. | |

**PLAINTIFF MR. FONTROY'S OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

**STATEMENT OF THE CASE**

This case arose from an incident on September 2, 2015 at about 10:30 pm (Fontroy trial transcript, p. 13; Officer Onoja) in the dark, unlighted driveway on the side of Stanton Liquor at 1044 Bladensburg Rd NE, Washington, DC 20002. Pl's Dep. Ex. # 4, Exhibit 11 (authenticated by Mr. Young at 159:3-18, Exhibit 1); Pl's Dep. Ex. # 13, Exhibit 12 (authenticated by Mr. Young at 171:13-172:14, Exhibit 1). The key facts are hotly contested.

The parties agree that what started this whole incident was Officer Onoja's order to Mr. Young to pick up and throw away a beer can which Officer Onoja - before confronting Mr. Young - had never checked was open, or even had beer in it, and to leave the area. Officer Onoja used violence on and assaulted Mr. Young when he refused to pick up the can and leave. The disputed issue is why Officer Onoja used violence on and assaulted Mr. Young.

Mr. Fontroy in turn technically "assaulted" Officer Onoja (though he never touched him or uttered "threats") by approaching and yelling and cursing at him, Fontroy Trial Tr. at 50, Exhibit 5 (findings of court), because he was angry that Officer Onoja had slammed Mr. Young to the

ground for no reason and he was arresting him for "constructively possessing" a can of beer that was not his. Defendants' Ex. F, the Superior Court CourtView docket in Mr. Fontroy's case.

In his sworn <u>Gerstein</u>, Officer Onoja falsely swore that he saw Mr. Fontroy remove the can "from the scene," pour out the contents, and then hide the can. Exhibit 15. The <u>Gerstein</u> refers to the can as "open" but it does not say if or when in the sequence of events Officer Onoja verified that fact. The facts in Mr. Young's case and this case show it was after the arrest if at all. For example, Officer Onoja rode past the can in the dark alley and shone his flashlight on it, and noticed it had condensation on the outside of the can, but he never touched it or even approached it before confronting Mr. Young. Fontroy Dep. at 134:3-7, Exhibit 2(Officer Onoja never touched the can or picked it up); Onoja Dep. (Fontroy case) at 30:5-10; 20:15-21:2, Exhibit 4.

At Mr. Fontroy's trial, Officer Onoja testified that the beer can was left in the alley when he brought Mr. Young out, Fontroy Trial Tr. at 18-19, Exhibit 5, and that he saw Mr. Fontroy pick it up and walk off with it, and empty it out while Officer Onoja was on the sidewalk crouched down with Mr. Young. *Id.* Mr. Fontroy testified at trial and denied touching the can. *Id.* at 31:3-7.

The video does not show Mr. Fontroy touching a can. Nor does it show Officer Onoja retrieving a can and checking its contents for beer though he says on the <u>Gerstein</u> that he did.

By the time back up arrived Mr. Fontroy had walked away from Officer Onoja and was standing out in the street. Exhibit 9 at 00:01:48, 00:02:04. The video shows he never tried to flee, not even when Officer Onoja leapt up and sprinted at him. Exhibit 9 at 00:01:48 to 00:02:15. The moment back up swarmed the area and took over custody of Mr. Young, 2:14, Officer Onoja sprinted over to where Mr. Fontroy was standing, grabbed him, pulled his hands behind his back, and tackled him to the ground for no reason, 00:02:15, while Mr. Fontroy was talking to arriving officers. Fontroy Dep. at 132:7-14; 136:18-20; 142:7-8, Exhibit 2; Exhibit 9.

## I.    Statement of Facts.

On the night of September 2, 2015 at about 10:30 pm, Mr. Young and Mr. Fontroy and some friends were at Stanton Liquor.

On that night their friends included Donald McCormick and Ray Carter; "Nut" and "Dominique" were also there. Young Dep. at 95:2-3, 86-87, Exhibit 1. The neighbors in the house next to Stanton were hanging out in their yard, and people were going up and down the street. Fontroy Dep. at 86-87, Exhibit 2.

Everyone was feeling nice, socializing, taking the air, enjoying the evening and each other's company – until Officer Onoja crept up from the rear on his bike and shattered their pleasant evening. By the time the night was over, Officer Onoja had sent Mr. Young to jail – and to the hospital after that – simply because Mr. Young refused Officer Onoja's unlawful order to pick up a beer can that was not his and leave.

The neighborhood still has not recovered. That night Officer Onoja gave them living proof that the stories of police brutality crowding the airwaves that summer were not just stories.

### 1.    The Trinidad Neighborhood is Walter Fontroy's Home.

Walter Paige (hereinafter "Walter Fontroy," which is his mother's maiden name) is a 45-year-old man who has lived his entire life in the Trinidad neighborhood in Northeast, DC with his uncle Stanley Ross. Fontroy Dep. at 9:3-10; 22:8-15, Exhibit 2. It is an area in the city he considers his home. Fontroy Dep. at 10-12, Exhibit 2. Mr. Fontroy has known Mr. Young since he was 16 years old. Fontroy Dep. 46:20-47:1, Exhibit 2. He attended school at Webb Elementary and Hamilton Junior High. Fontroy Dep. 10:7-9, Exhibit 2. He has been trained in resurfacing. Fontroy Dep. 110:15-17, Exhibit 2. From on or about 2006 to 2007, he worked for Wonder Automotives changing oil and doing clean up. Fontroy Dep. 14-22; 30:2-4, Exhibit 2. Prior to that, he worked for Renewed Surfaces doing work surface work on bathtubs. Fontroy Dep. 27:14-21,

Exhibit 2. Mr. Fontroy has lived so long in the Trinidad neighborhood he knows employees at

some of the local businesses. Fontroy Dep. 25:9-14, Exhibit 2. Mr. Fontroy has one daughter who

is twenty-four years old. Fontroy Dep. 23:1-3, Exhibit 2.

   2.   **Officer Onoja has a History of Harassing Mr. Fontroy and his Friends.**

        Prior to September 2, 2015, Officer Onoja had developed animus towards Mr. Fontroy as

evidenced by several instances Officer Onoja harassed him and others in the Trinidad

neighborhood. Several incidents with Officer Onoja prior to and including the incident on

September 2, 2015. *Id.* at 51:2-4, Exhibit 1. These facts are critical not just in establishing Officer

Onoja had animus towards Mr. Fontroy on the night of September 2, 2015 but also reflect several

instances where the District was put on notice of Officer Onoja's unconstitutional conduct.

        Specifically, before the incident, Officer Onoja had harassed Mr. Fontroy and his friends at

least three times that same year. *Id.* at 26:16-22, Exhibit 1. In about August 2015, Mr. Fontroy and

some friends were playing cards in a fenced in yard on private property (*Id.* at 47:1-8, Exhibit 1)

that belonged to Phaedra White (Carter Dep. at 31:5-8, Exhibit 8) when Officer Onoja

approached in his police cruiser (Pl's Dep. at 47:15-19, Exhibit 1). Even though Mr. Young, Mr.

Fontroy, and the others were simply playing cards and not bothering anyone, Officer Onoja

ordered everyone onto the ground. *Id.* at 53:14-16, Exhibit 1. Officer Onoja came onto the private

property, *Id.* at 55:17-18, Exhibit 1, and then threatened to lock everyone up after noticing a beer

can out in the grass (Carter Dep. at 29:13-18, Exhibit 8), six feet from the card table (*id.* at 33:9-11)

that had been there for about a week (*id.* at 34:19-22, Exhibit 8). Officer Onoja collected

everyone's identification cards to check for warrants. *Id.* at 29:22-30:2, Exhibit 8. Then, he

ordered them to stop playing cards. *Id.* at 30: 3-4, Exhibit 8.

        Fortunately, Officer Onoja's supervisor showed up, Pl's Dep. at 54:15-17, Exhibit 1, and

the supervisor told Officer Onoja Mr. Fontroy and his group had the right to play cards and

congregate. *Id.* at 30:6-8, Exhibit 1.  This instance is one example where a superior officer received and responded to a complaint for the way Officer Onoja treated residents, including Mr. Fontroy, in the neighborhood.

In another instance, in about July 2015, Officer Onoja ordered Mr. Young, Mr. Fontroy, and Mr. Carter to stop standing on the grass part of the sidewalk in front of Mudricks (a corner store on Bladensburg Road). Carter Dep. at 18:5-17, Exhibit 8. Standing and hanging out is something folks have been doing for years in the neighborhood until "everything started to change." *Id.* at 18:8-10, Exhibit 8.[1]

Despite the fact there was room on the sidewalk for others to walk (*Id.* at 18:20-21, Exhibit 8), no one was drinking, no one was using drugs, and no one was doing anything illegal (Carter Dep at 18:22-19:7, Exhibit 8), he ordered them to move. In addition, Officer Onoja physically pushed Mr. Fontroy down the street multiple times about three feet down the street. *Id.* at 19:5-21, Exhibit 8. Like how a parent treats a child, Officer Onoja continued to escort Mr. Fontroy down the street for about eight feet down the sidewalk. *Id.* at 21:9-12, Exhibit 8. Officer Onoja also threatened to lock everyone up. *Id.* at 22:4-6, Exhibit 8. This instance is another example where Officer Onoja used physical force against neighborhood citizens without probable cause and used heavy-handed police tactics to intimidate Trinidad residents.

Officer Onoja is well known in the neighborhood for harassing citizens and getting complaints filed against him. Pl's Dep. at 59:2-9, Exhibit 1; Carter Dep. at 17:9-10, Exhibit 8; Fontroy Dep. at 40:15-16, Exhibit 2. He has also been witnessed using excessive force repeatedly

---

[1] Ordering African Americans who are standing still on the sidewalks or bordering areas to leave the area is part of a larger pattern of the District using its "blocking passage" statute to banish African Americans, especially African American males, and homeless people from public spaces in gentrifying areas. PCB Policy Report #17-3: Blocking Passage, issued May 23, 2017. https://policecomplaints.dc.gov/sites/default/files/dc/sites/office%20of%20police%20complaints/publication/attachments/Blocking%20Passage%20Report.FINAL_.pdf. Exhibit 46.

in the neighborhood. Carter Dep. at 57-71, Exhibit 8.  In another instance recounted by Ray Carter, Officer Onoja approached Mr. Carter while he was working on his van on 16ᵗʰ Street Northeast. *Id.* at 23:1-3, Exhibit 8. Officer Onoja rode up to Mr. Carter and demanded to know the contents of his Styrofoam cup under threat of arrest. *Id.* at 23:3-9, Exhibit 8. Mr. Carter requested a "white shirt" or supervising official in MPD to come to the scene. *Id.* at 23:20-24:3, Exhibit 8. The supervising officer informed Officer Onoja he did not have the authority to order Mr. Carter to pour his cup out under threat of arrest. *Id.* at 27:13-20, Exhibit 8. This supervising officer is the same officer who responded to the scene where Officer Onoja harassed the group of people playing cards on Phaedra White's property. *Id.* at 32:6-11, Exhibit 8. This instance is another example where a supervising officer received and responded to a citizen complaint against Officer Onoja—putting the District on notice of Officer Onoja's unconstitutional conduct.

In another interaction with Mr. Young, Mr. Carter, and Donald McCormick, Officer Onoja approached them in the same alley they were previously playing cards. *Id.* at 37:12-18, Exhibit 8. Officer Onoja informed them he was watching everyone, knew what type of beer they drink, exactly the time they go to the store, and that was going to catch and arrest them. *Id.* at 37:19-38:2, Exhibit 8. That included telling Ray Carter that Officer Onoja knew that Mr. Carter drank Beck's beer.  *Id.* at 42:3-19, Exhibit 8.

3. **The District knows about other violent, abusive acts of Officer Onoja and still authorizes him to make arrests and use force against his fellow citizens.**

In two of these incidents Officer Onoja's abusive, unconstitutional conduct was known to supervisors. But, the MPD did not discipline Officer Onoja for these events and still he's in the field making arrests and authorized to use force. In fact, Officer Onoja was promoted from a

patrol officer to a crime suppression team officer in March of 2016. Onoja Dep. (Young Case) 15:1-9, Exhibit 3

The District and Officer Onoja's supervisors know about other violent, abusive acts of Officer Onoja and still authorizes him to make arrests and use force against his fellow citizens. Some examples include:

JOSEPH ALEXANDER

On August 8, 2015, Officer Onoja falsely arrested Joseph Alexandar for incommoding or "blocking passage" on the sidewalk. According to Officer Onoja, Mr. Alexander and a group of more than six individuals were completely and totally blocking the sidewalk at 1044 Bladensburg Road. *Id.* at 206:1-15, Exhibit 3. Officer Onoja claimed to have personally witnessed this activity. *Id.* at 206:20-207:1, Exhibit 3. After he claims to have given a dispersal order, Officer Onoja claimed that Mr. Alexander came back and stood right back blocking the sidewalk. *Id.* at 207: 8-22, Exhibit 3. Finally, Officer Onoja claimed that Mr. Alexandar by himself completely blocked the passage. *Id.* at 207:20-22, Exhibit 3.

Officer Onoja acknowledged the limited circumstances in which an Officer can arrest someone for incommoding. The individual or individuals must totally block the path of travel. *Id.* at 203:3-7, Exhibit 3. If someone could walk around, that does not constitute incommoding. *Id.* at 203:7-9, Exhibit 3. Its not a violation of the statute to stand on the sidewalk when no one else is around. *Id.* at 203:10-15, Exhibit 3. In addition, its not a violation of the statute to walk up and down the sidewalk. *Id.* at 204:1-3, Exhibit 3.

Security footage from Stanton Liquor that captured Officer Onoja and Mr. Alexander's interaction tell a much different story than Officer Onoja's sworn deposition testimony. At 5:07, the surveillance video shows Officer Onoja approach on his bicycle three African American male individuals in front of Stanton Liquor. Exhibit 19. No individuals are trying to walk down the

sidewalk. Exhibit 19. The three individuals are clearly not blocking the sidewalk in its entirety. Exhibit 19. At about 5:54, with Officer Onoja still on the scene, the individuals all disburse. Exhibit 19.

Mr. Alexander walks up and down the sidewalk a few times and then goes off camera.  Mr. Alexander returns again at about 9:28 seconds. Exhibit 19. At 12:39, Mr. Alexander is seen walking down the sidewalk another time and Officer Onoja immediately places Mr. Alexander under arrest. Mr. Alexander is by himself, not blocking passage, and just walking on the sidewalk. Exhibit 19. Officer Onoja was never investigated for his arrest of Mr. Alexander despite at least one other officer witnessing the unlawful incident. Onoja Dep. (Young Case) 214:1-18, Exhibit 3. When Officer Onoja arrested Mr. Alexander he was acting consistent with MPD custom, policy, and practices.  *Id.* at 214:12-15. This false arrest is a text book example of MPD officers banishing young African American males from the sidewalk as discussed in the Office of Police Complaint Report *supra* fn. 1.

WILLIAM HALL

William Hall is a twenty-six-year-old asthmatic African American mail who frequented the Trinidad neighborhood to often do manual labor on a contract basis. Hall Dep. at 31-32, Exhibit 6. In or about April of 2015, Officer Onoja arrested him for unlawful entry at the 7-Eleven on Bladensburg road. *Id.* at 36:19-20; 37:19-22, Exhbit 6. Mr. Hall used to frequent the 7-Eleven about two times a day throughout 2015. *Id.* at 40:3-8, Exhibit 6. On the day of his first arrest by Officer Onoja, Mr. Hall was walking down the street past the 7-Eleven and Officer Onoja made several inappropriate comments to him. *Id.* at 41:4-9, Exhibit 6.  Officer Onoja told Mr. Hall that he "can't walk on this side of the street" and that he "told you [Mr. Hall] to stay off my block to 1200 Bladensburg road." *Id.* at 41:4-13, Exhibit 6.

Officer Onoja chased him and arrested him. *Id.* at 42: 8-10, Exhibit 6.  Despite the arrest for unlawful entry, the government declined to file charges against Mr. Hall. *Id.* at 42:15-17, Exhibit 6. Mr. Hall never actually entered the 7-Eleven where he was purportedly barred but Officer Onoja arrested him nonetheless while he was walking to the Dollar Plus store. *Id.* at 46:5-13, Exhibit 6. At least two other MPD officers participated in this unlawful arrest. *Id.* at 53:17-20, Exhibit 6.

Officer Onoja slammed Mr. Hall up against a vehicle after placing him in cuffs. *Id.* at 54:11-16, Exhibit 6. During 2015, Mr. Hall had more than 10 interactions with Officer Onoja he considered harassment. *Id.* at 55:17-21, Exhibit 6. Officer Onoja would follow Mr. Hall down the street for no reason. *Id.* at 56: 5-12, Exhibit 6. Officer Onoja repeatedly told Mr. Hall to stay off the 1200 block of Bladensburg Road. *Id.* at 56:18-29, Exhibit 6.

Officer Onoja would often call out Mr. Hall's name in front of people in the neighborhood to give off the perception Mr. Hall was a "snitch." *Id.* at 59:2-7, Exhibit 6. Such conduct put Mr. Hall's safety in jeopardy. *Id.* at 59:6-7, Exhibit 6. On other days, Officer Onoja would just follow Mr. Hall around for 10 to 15 minutes. *Id.* at 82:8-13, Exhibit 6. One week prior to a use of force incident with Mr. Hall, Officer Onoja told Mr. Hall was "was going to get him." *Id.* at 84: 8-19, Exhibit 6.

On October 27, 2015, Officer Onoja did in fact "get" Mr. Hall.  Mr. Hall was walking down Bladensburg road with a friend when he first noticed Officer Onoja on a bicycle. *Id.* at 100:4-8, Exhibit 6. Officer Onoja approached him on his bicycle on the sidewalk of Bladensburg Road in front of the Denny's.  *Id.* at 102: 8-17, Exhibit 6. Officer Onoja told Mr. Hall and his friend they needed to leave the sidewalk and then proceeded to follow them once they started walking away. *Id.* at 103:8-21, Exhibit 6. Officer Onoja continued to follow Mr. Hall who was walking on foot directly behind him on the sidewalk on his bicycle. *Id.* at 105:12-22, Exhibit 6.

Mr. Hall asked Officer Onoja to stop following him. *Id.* at 107:7-8, Exhibit 6. Despite Mr. Hall's repeated requests for Officer Onoja to stop harassing him, Officer Onoja followed him to the gas station and ordered him to leave while Mr. Hall was in line waiting to purchase a cigar and some candy. *Id.* at 109:14-110:4, Exhibit 6. Mr. Hall left the store and went to the Dollar Plus on Bladensburg Road. *Id.* at 112:1-6, Exhibit 6. Undeterred, Officer Onoja continued to follow him and waited outside the Dollar Plus Store. *Id.* at 112:1-6, Exhibit 6.

Mr. Hall continued walking down Bladensburg road when Officer Onoja rode up behind him, jumped off his bike and grabbed Mr. Hall by the arm. Exhibit 17, 00:10:20. Mr. Hall asked why Officer Onoja's grabbed his arm and Officer Onoja stated "you're resisting arrest" to which Mr. Hall asked Officer Onoja what was his probable cause to arrest him. Hall Dep. 119:19-120:2, Exhibit 6. Officer Onoja told Mr. Hall that he did not need probable cause. *Id.* at 120:3-4, Exhibit 6. A struggle ensued and Officer Onoja slammed Mr. Hall to ground, punched Mr. Hall in the face at least five times, and doused Mr. Hall in the face with pepper spray after Mr. Hall was subdued. Exhibit 17, 00:10:25-00:11:40. At all times during his interaction with Mr. Hall, Officer Onoja was acting consistent with MPD policies, customs, and practices. Onoja Dep (Hall Case) 174:22-175:3, Exhibit 7.

CHAMBERS JUNES

Mr. Hall is not the only citizen Officer Onoja has been quick to pepper spray. Officer Onoja sprayed Chambers Junes, a resident of the Trinidad neighborhood, in the face with pepper spray while investigating if Mr. Junes' closed Gatorade bottle located in Mr. Junes bike cup holder, contained alcohol. Exhibit 18. Officer Onoja approached Mr. Junes in an alley where Mr. Junes is standing immediately adjacent to his bicycle. Exhibit 18. Officer Onoja's body worn camera does not capture the volume of the first initial approximately twenty seconds of their conversation. Exhibit 18, 00:00:11-00:00:31.

Mr. Junes attempts to walk his bicycle out of the alley and Officer Onoja follows him. *Id.* at 00:00:31. As Mr. Junes is walking away, Officer Onoja grabbed him from behind, turned him by the shoulder, and doused him in face with pepper spray. *Id.* at 00:01:20:-00:01:24. After Mr. Junes became visibly upset, Officer Onoja slammed him to the ground. Exhibit 18. This incident all stemmed from Officer Onoja spotting an orange yellowish liquid in Mr. Junes Gatorade bottle. Onoja Dep (Young Case) 225:9-15, Exhibit 3. The bottle had a lid on it. Onoja Dep. (Young Case) 225:14-15, Exhibit 3. Mr. Junes was not drinking out of the bottle when Officer Onoja stopped him. *Id.* at 227:5-7, Exhibit 3. Officer Onoja claimed Mr. Junes struck him with his right hand and that his body worn camera captured the incident. *Id.* at 233:16-19, Exhibit 3. However, Officer Onoja's body worn camera video does not show Mr. Junes trike Officer Onoja. Exhibit 18. When Officer Onoja pepper-sprayed Mr. Junes during the course of a POCA arrest, he was acting consistent with MPD customs, policies, and practices. Onoja Dep (Young Case) 233:18-22, Exhibit 3.

Many others are listed from Officer Onoja's personnel file in Mr. Young's Statement of Material Facts and filed under seal based on this Court's Protective Order, and discussed below in the section on the Monell claim.

### 4.  The September 2, 2015 Incident: Officer Onoja attacked Mr. Young for refusing to pick up a beer can that was not his and leave the area.

On September 2, 2015, Mr. Fontroy began his day at about 9:00 a.m. Fontroy Dep. 76:16-20, Exhibit 2. That afternoon, he arrived at Phaedra White's house around 3:00 or 4:00. Fontroy Dep. 79:13-15. According to Mr. Fontroy, him, Mr. Young, and Ms. White left together to go to Stanton Liquors. Fontroy Dep. 80:16-18, Exhibit 2.

Mr. Fontroy saw Officer Onoja ride his bicycle up through the alley adjacent to Stanton Liquors. Fontroy Dep. 8-12, Exhibit 2. Before Officer Onoja arrived, Mr. Fontroy never saw Mr.

Young with a beer. Fontroy Dep. 85:18-22, Exhibit 2. Mr. Fontroy believes he saw Officer Onoja first. Fontroy Dep. 89:1-4, Exhibit 2. When Officer Onoja arrived, Mr. Fontroy was closer to the beer can than Mr. Young. Fontroy Dep. 89:10-14, Exhibit 2. Mr. Fontroy says Mr. Young was on the sidewalk about eight to ten feet from the can in the alley, and Mr. Fontroy was in the alley about three to four feet from the can. Fontroy depo., 116:10-12, Exhibit 2. Mr. Young was standing in front of the Stanton Liquors. Fontroy Dep. 90:1-3, Exhibit 2.

Mr. Fontroy was standing in the driveway entrance of the alley. Fontroy Dep. 96:8-9, Exhibit 2. Officer Onoja rode his bike to the front of the store on the sidewalk of Bladensburg Road. Fontroy Dep. 114:14-21, Exhibit 2. Officer Onoja turned right out of the alley (Fontroy Dep. 115:3-5, Exhibit 2) and left his bike to the side of the door to the Stanton Liquor (Fontroy Dep. 115:17-20, Exhibit 2). After Officer Onoja arrived, Mr. Fontroy heard Officer Onoja tell Mr. Young to pick up the beer can. Fontroy Dep. 104:2-6, Exhibit 2. Prior to Officer Onoja's arrival, Mr. Fontroy never saw anyone touch or take a drink from the can. Fontroy Dep. 105:2-7, Exhibit 2. After Mr. Young refused to pick up the can, Officer Onoja slammed Mr. Young to the ground. Fontroy Dep. 118:8-11, Exhibit 2.

The only thing Mr. Young said to Officer Onoja was I'm not picking that can up. Fontroy Dep. 118:21-22, Exhibit 2. After watching Officer Onoja needlessly violently slam Mr. Young to the ground, Mr. Fontroy began using profanity. Fontroy Dep. 124:19-21, Exhibit 2. He was angry that Officer Onoja slammed his friend of almost 26 years to the ground for no real reason. Fontroy Dep. 124:21-125:1, Exhibit 2. After slamming Mr. Young to the ground, Officer Onoja called for backup on his radio. Fontroy Dep. 125:15-18, Exhibit 2. Officer Onoja kept telling Mr. Fontroy to back up. Fontroy Dep. 126-3-5, Exhibit 2. Mr. Fontroy cursed out Officer Onoja because he felt the officer should not have slammed his friend to the ground unprovoked. Fontroy Dep. 127:19-22, Exhibit 2. Furthermore, Mr. Fontroy did not begin cursing at Officer Onoja until after Officer

Onoja slammed Mr. Young to the ground. Fontroy Dep. 119:1-3; 122:2-3, Exhibit 2. Despite the fact he was cursing and approaching, Mr. Fontroy never got within arm's length of Officer Onoja while Officer Onoja was on top of Mr. Young. Fontroy Dep. 9-10, Exhibit 2.

At all times during the interaction, Mr. Fontroy did not have any weapons on him. Fontroy Dep. 129:14-15, Exhibit 2. Furthermore, he never threatened that he was going to get a weapon or that he was going to attack Officer Onoja. Fontroy Dep. 129:18-130-4, Exhibit 2. In response to Mr. Fontroy's steps and cursing, Officer Onoja swung his baton at Mr. Fontroy a couple of times. Fontroy Dep. 130:10-12, Exhibit 2. However, Ms. White did make a threatening statement to Officer Onoja to the effect of "that I kill you." Fontroy Dep. 131:13, Exhibit 2; Exhibit 9.

5.   **Mr. Fontroy had stopped cursing and approaching Officer Onoja and he had walked about 15 feet away and stood submissively by the time Officer Onoja tackled Mr. Fontroy.**

The crucial facts for Mr. Fontroy's excessive force/assault and battery claim are that by the time Officer Onoja tackled Mr. Fontroy, and slammed him to the ground, Mr. Fontroy had ceased yelling at and approaching Officer Onoja. Officer Onoja conceded on cross examination in Mr. Fontroy's criminal trial that Mr. Fontroy at that point was not attempting to flee, Fontroy Trial Tr. at 27, Exhibit 5, nor did he offer any resistance whatsoever, *Id.* at, 27-28, Exhibit 5.

Mr. Fontroy's had retreated about 15 feet from Officer Onoja and he was not fleeing or threatening anyone. He was standing in the street with his hands at his side. Exhibit 9 at 00:01:48 to 00:02:15.

6.   **Backup arrives: Officer Onoja still used violence against Mr. Fontroy when he grabbed him and tackled him after Mr. Fontroy had retreated and assumed a submissive posture.**

As soon as backup arrived, several marked police cars pulled up, blocked the street, and had their lights and sirens activated. Fontroy Dep. 140: 17-19, Exhibit 2; Exhibit 9. Mr. Fontroy's demeanor changed and he backed off. Onoja Dep. (Fontroy Case) 123:15-18, Exhibit 4; Exhibit 9. The situation had deescalated and Officer Onoja felt safer. Onoja Dep. (Young Case) 161:13-21,

Exhibit 3. In fact, Officer Onoja felt so much safer he felt comfortable leaving Mr. Young

unattended. Onoja Dep. (Young Case) 164:17-165:3, Exhibit 3. The scene was secure. Onoja

Dep. (Young Case) 169:7-11, Exhibit 3. Within less than 10 seconds of additional officers' arrival,

Officer Onoja left Mr. Young and ran over and slammed Mr. Fontroy to the ground from behind

while Mr. Fontroy was talking to arriving officers. Fontroy Dep. 132:7-14; 136:18-20; 142:7-8,

Exhibit 2; Exhibit 9. Officer Onoja slams him to the ground despite the fact that Mr. Fontroy

offered no resistance. Onoja Dep. (Young Case) 165:14-15, Exhibit 3.

      As a result of Officer Onoja's violent slam-down, Mr. Fontroy landed on concrete on his

shoulder and part of his face. Fontroy Dep. 142:16-17, Exhibit 2. Immediately subsequent to the

violent slam-down, Officer Onoja pulled Mr. Fontroy's arms back and cuffed him in a painful

manner. Fontroy Dep. 145:10-22, Exhibit 2. Officer Onoja stated to what seemed like 30 officers

arriving to the scene to "get them" referring to Ms. White and Mr. Fontroy. Fontroy Dep. 136:16-

17. Exhibit 2. Officer Onoja did not take use any force in effectuating an arrest of Ms. White

despite her threat to kill him (Fontroy depo., 131:7-15, Exhibit 2) but pointed at her as he told

arriving officers to get them. Fontroy Dep. 137:1, Exhibit 2; Exhibit 9.

      Mr. Fontroy never touched the can, let alone moved the can. Fontroy Dep. 132:20-133:3,

Exhibit 2. Officer Onoja never commanded Mr. Fontroy to get on the ground. Fontroy Dep.

139:13-17; 140:3-6; 14, Exhibit 2. As a result of his arrest, Mr. Fontroy spent the night in jail and

was not released until 5:00 p.m. the next day. Fontroy Dep. 149:18-150:3, Exhibit 2. Mr. Fontroy

was emotionally distraught and depressed over his arrest and the force Officer Onoja used against

him after he had retreated and submitted. Fontroy Dep. 150:16-18; 151:12-19, Exhibit 2. As a

result of the arrest and violent slam-down down, Mr. Fontroy felt back pain from sleeping on the

cold steel all night. Fontroy Dep. 153:14-18, Exhibit 2. Mr. Fontroy was charged with assaulting a

police officer and served 30 days in jail after being acquitted for a tampering with evidence charge

where Officer Onoja alleged Mr. Fontroy moved the beer can. Fontroy Dep. 157:1-4, Exhibit 2. Officer Onoja charged Mr. Fontroy with assault on a police officer because he advanced towards him and intimidated him. Onoja Dep. (Fontroy Case) 99:17-22, Exhibit 4.

Despite the video evidence in relation to Officer Onoja's slam-down, Officer Onoja was never investigated by the Metropolitan Police Department. Onoja Dep. (Fontroy Case) 128:21-129:1, Exhibit 4. Officer Onoja was never disciplined as a result of his interaction with Mr. Fontroy. Onoja Dep. (Fontroy Case) 129:10-13, Exhibit 4.

In fact, at all times during his interaction with Mr. Fontroy, Officer Onoja was acting consistent with MPD customs, policies, and procedures. Onoja Dep. (Fontroy Case) at 128:10-15, Exhibit 4.

### 7.  What can? Officer Onoja Falsely Accused Mr. Fontroy of "Tampering with Evidence."

Officer Onoja falsely accused Mr. Fontroy of "tampering with evidence" in violation of 23 D.C. Code § 723 (2001 ed.). (R. 14, Information.). Tampering with evidence is a misdemeanor with a maximum penalty of 180 days.

The video does not show Mr. Fontroy touching a can. Nor does it show Officer Onoja retrieving a can and checking its contents for beer though he says on the <u>Gerstein</u> that he did.

Mr. Fontroy never touched the can, let alone moved the can. Fontroy Dep. 132:20 to 133:3, Exhibit 2; Fontroy Trial Tr. at 31:3-7, Exhibit 5.

In his <u>Gerstein</u> Officer Onoja never gives any details about where the can was when Mr. Fontroy allegedly touched or where he allegedly "hid" it. Exhibit 15. Nor during his trial testimony did Officer Onoja provide such details. Officer Onoja swore in his <u>Gerstein</u> that he recovered the can and put it on the evidence book. Exhibit 15. But, the government never produced the page from the evidence book or the can or even a picture at trial. Nor did defendants ever produce the page from the evidence book or the can or even a picture in discovery in this case.

Mr. Fontroy was tried in a bench trial held November 19, 2015 on a single count of assault and the single count of tampering with evidence, presided over by the Honorable Gregory Jackson. On the same day, the Court found Mr. Fontroy guilty of assaulting a police officer. The Court acquitted Mr. Fontroy of tampering with evidence. Fontroy Trial Tr., Exhibit 5; (R. 33, Judgment in a Criminal Case.)

## ARGUMENT

I. **Defendants' Motion For Summary Judgment On The Fabrication Of Evidence Claim Should Be Denied Because Mr. Fontroy States A Claim Under § 1983 For Fabrication Of Evidence, And The Facts About Whether He Ever Touched The Can Are Controverted.**
Defendants' motion for summary judgment on the fabrication of evidence claim should be denied because Mr. Fontroy states a claim under § 1983 for fabrication of evidence, and the facts about whether he ever touched the can are controverted.

In deciding defendants' motion for summary judgment, the Court must credit the plaintiff's version of events, even if uncorroborated and "directly contradictory" to police testimony, and the Court must draw all reasonable inferences in favor of the plaintiff as the nonmoving party. Robinson v. Pezzat, 818 F.3d 1, 8-9 (D.C. Cir. 2016) *citing* Tolan v. Cotton, 134 S. Ct. 1861, 1867 (2014).

Summary judgment is not appropriate in this case because Mr. Fontroy's version of the facts is markedly different from that of Officer Onoja's and so numerous issues of material fact exist, making summary judgment on this claim inappropriate. Saddler v. D'Ambrosio, 759 F. Supp. 4, 8 (D.D.C. 1990). Mr. Fontroy has come forward with facts that, if true, indicate that Officer Onoja's actions were objectively unreasonably and violated Mr. Fontroy fair trial rights under the 5th Amendment. Saddler v. D'Ambrosio, 759 F. Supp. 4, 8 (D.D.C. 1990).

A. **Officer Onoja swore out a false Gerstein and forwarded it to the prosecutor knowing the prosecutor would rely on it to make a decision whether to initiate a prosecution.**

Officer Onoja prepared a single arrest packet (police paperwork) in these cases on the day of the events, Onoja Dep. (Fontroy Case) at 53-55, 57, Exhibit 4, describing the events. *See* General Order 701.03 (Handling Assaults on Police Officers) sets forth in detail the obligations of an officer charging APO (assault on a police officer). General Order 701.03 (Handling Assaults on Police Officers), effective September 29, 2010. https://go.mpdconline.com/GO/PCA_701_03.pdf. Exhibit 15.

Page 5 of the Order also requires: "The official approving the Assault on a Police Officer charge shall ensure that the PD Form 163 or PD Form 379 fully describes all of the facts and circumstances of the event, to include the name of the approving official in the narrative." Page 5 also requires the officer / complainant to be "present during the papering process at the United States Attorney's Office," and to present the paperwork to the AUSA.

Officer Onoja also swore out a single Gerstein (a sworn statement of the facts based on the Prosecution Report, PD 163, Onoja Dep. (Fontroy case) at 55-56, Exhibit 4) for Mr. Young, Mr. Fontroy, and Ms. White on the day of the events. A "Gerstein proffer" is a document used by prosecutors to establish probable cause at the defendant's initial appearance before the court following his arrest. Littlejohn v. United States, 705 A.2d 1077, 1080 (D.C. 1997). Defendants' Ex. F, the Superior Court CourtView docket in Mr. Fontroy's case, shows that the Gerstein was filed and entered on the docket on 9/3/2015.

The Gerstein Officer Onoja filled out falsely stated: "During the incident, I, officer Onoja observed Def. Paige [Mr. Fontroy] removed the container of alcohol from the scene, and hid the can beside a vehicle not far from the scene in an attempt to remove evidence from the scene. Def. Paige also had poured out the content of the can." Exhibit 15.

In his sworn Gerstein, Officer Onoja wrote that he saw Mr. Fontroy remove the can "from the scene," pour out the contents, and then hide the can. The Gerstein refers to the can as "open"

but it does not say if or when in the sequence of events Officer Onoja verified that fact. The facts in Mr. Young's case and this case show it was after the arrest if at all. For example, Officer Onoja rode past the can in the dark alley and shone his flashlight on it, and noticed it had condensation on the outside of the can, but he never touched it or even approached it before confronting Mr. Young. Fontroy Dep. at 134:3-7, Exhibit 2 (Officer Onoja never touched the can or picked it up); Onoja Dep. (Fontroy case) at 30:5-10; 20:15-21:2, Exhibit 4.

Officer Onoja then turned in his false <u>Gerstein</u>, Onoja Dep. (Fontroy Case) at 100, knowing that it would be forwarded to the prosecutor, General Order 701.03 (Handling Assaults on Police Officers), Defendants' Ex. F (Superior Court CourtView docket in Mr. Fontroy's case showing the Gerstein was filed and entered on the docket on 9/3/2015).

The false <u>Gerstein</u> effectively hijacked the prosecutor's independent judgment and caused the prosecutor to initiate and advance prosecutions based on the fabrications in the Gerstein and the police reports. The injury occurred to Mr. Fontroy when the false evidence reached the prosecutor.

Mr. Fontroy never touched the can, let alone moved the can. Fontroy Dep. 132:20-133:3, Exhibit 2; Fontroy Trial Tr. at 31:3-7, Exhibit 5.

The video does not show Mr. Fontroy touching a can. Nor does it show Officer Onoja retrieving a can and checking its contents for beer though he says on the <u>Gerstein</u> that he did.

> **Comment [SL1]:** This has been said verbatim previously

In Mr. Fontroy's trial on tampering and assault on a police officer, the Judge heard Officer Onoja's testimony that Mr. Fontroy moved the can and he observed his demeanor. The Judge heard also heard Mr. Fontroy's testimony and observed his demeanor. The Judge implicitly made an adverse credibility finding against Officer Onoja because he refused to convict in the absence of video of the alleged tampering. Fontroy Trial Tr. at 50. Exhibit 5.

1.  **The Trial Judge in Mr. Fontroy's Superior Court Trial Implicitly Made an Adverse Credibility Finding against Officer Onoja Because He Refused to Convict in the Absence of Video of The Alleged Tampering.**

The trial court made findings of facts which begin at page 50 of the transcript. Fontroy Trial Tr., Exhibit 5. The court based his findings of fact "based on the video" rather than on the testimony of Officer Onoja.

The trial court did not credit any aspect of Officer Onoja's testimony that was not supported by the video tape. For example, there is no finding that the trial court determined that Officer Onoja's interpretation of Mr. Fontroy's words as constitution a threat or a challenge was reasonable. Fontroy Trial Tr. at 50 et seq, Exhibit 5.

With respect to the APO (assaulting a police officer) charge, there is no finding that the trial court credited the testimony of Officer Onoja as to what Mr. Fontroy was doing and saying and what the crowd was saying. *Id.*

For example, even though Officer Onoja clearly testified that, "I observed ... Mr. Page pick [the beer can] up and walked off with it ...[e]mpty it out and place it on a, beside the rear tire of a, of a vehicle that was parked by, nearby," Fontroy Trial Tr. at 19, Exhibit 5, the trial court nonetheless found that "I just don't think I have sufficient evidence to warrant that because the video shows him on the street." Fontroy Trial Tr. at 52.

With respect to the APO charge, the trial court found that "So, **based on the the, video**, I believe it's more than sufficient to satisfy the requirements set forth in <u>Cheek</u>." (emphasis added) Fontroy Trial Tr. at 51, Exhibit 5. The trial court found **based on the video** that, "It was, a, the officer had somebody on the ground, handcuffs, and you're yelling and screaming and approaching the officer." Summing up, the trial court found, "So, I'm gonna believe the Government has established, **based on the video**, guilt beyond a reasonable doubt of performing assault on a police officer." (emphasis added) Fontroy Trial Tr. at 52, Exhibit 5.

On the tampering charge, the trial court found, "With respect to the tampering with physical evidence, I just don't think I have sufficient evidence to warrant that because the video shows him on the street." Fontroy Trial Tr. at 52, Exhibit 5. The trial court acquitted Mr. Fontroy on the tampering charge.

**2. Officer Onoja's sworn Gerstein that falsely stated Mr. Fontroy moved and hid the beer can is independently actionable; Mr. Fontroy does not rely on Officer Onoja's trial testimony.**

Officer Onoja's sworn Gerstein that falsely stated Mr. Fontroy moved and hid the beer can is independently actionable. Coggins v. Buonora, 776 F.3d 108, 113-14 (2d Cir. 2015). Mr. Fontroy does not rely on Officer Onoja's trial testimony.

The crux of Mr. Fontroy's claim is that Officer Onoja created false information in the Gerstein and forwarded that Gerstein to prosecutors. See Ricciuti v. NYC Transit Authority, 124 F.3d 123, 130 (2d Cir. 1997). When a police officer creates false information likely to influence a jury's decision and forwards that information to prosecutors, he violates the accused's constitutional right to a fair trial, and the harm occasioned by such. *Id.*

**B. Mr. Fontroy states a claim under § 1983 for fabrication of evidence; the right to be free from being framed on fabricated evidence is "obvious" and clearly established by the Supreme Court and a consensus of the Circuits.**

**1. It is clearly established that fabricating evidence by manufacturing it during investigation is illegal and violates fair trial rights.**

It is clearly established that fabricating evidence by manufacturing it during the investigation is illegal and the Supreme Court has held it violated due process dating back to the Court's early decisions in Napue v. Illinois and Mooney v. Holohan. See Napue, 360 U.S. at 269 (recognizing that this right is "implicit in any concept of ordered liberty"); Mooney v. Holohan, 294 U.S. 103, 112 (1935) (stating that due process is not satisfied "if a State has contrived a conviction through the pretense of a trial which in truth is but used as a means of depriving a defendant of liberty through a deliberate deception of court and jury by the presentation of testimony known to be perjured").

When a police officer creates false information likely to influence a jury's decision and forwards that information to prosecutors, he violates the accused's constitutional right to a fair trial, and the harm occasioned by such. <u>Ricciuti v. NYC Transit Authority</u>, 124 F.3d 123, 130 (2d Cir. 1997).

As the U.S. Court of Appeals for the First Circuit recently put it, "if any concept is fundamental to our American system of justice, it is that those charged with upholding the law are prohibited from deliberately fabricating evidence and framing individuals for crimes they did not commit." <u>Limone v. Condon</u>, 372 F.3d 39, 44-45 (1st Cir. 2004) *citing* <u>Devereaux v. Abbey</u>, 263 F.3d 1070, 1075 (9th Cir. 2001), *cited in* Article: Innocence, Harmless Error, And Federal Wrongful Conviction Law, 2005 Wis. L. Rev. 35, 94

The 9th Circuit sitting *en banc* held that the right was clearly established even without prior precedent because "the proposition is virtually self-evident." <u>Devereaux v. Abbey</u>, 263 F.3d 1070, 1075 (9th Cir. 2001). So, under <u>United States v. Lanier</u>, 520 U.S. 259, 271, 137 L. Ed. 2d 432, 117 S. Ct. 1219 (1997) government officials have "fair and clear warning" that their conduct is unlawful. <u>Devereaux v. Abbey</u>, 263 F.3d 1070, 1075 (9th Cir. 2001).

A general constitutional rule already identified in the decisional law may apply with obvious clarity to the specific conduct in question, even though 'the very action in question has [not] previously been held unlawful,' and such is the case here. <u>Hope v. Pelzer</u>, 536 U.S. 730, 741 (2002).

A majority of courts have accepted the rule in civil cases and have created a consensus in the circuits. Youngbey v. March, 676 F.3d 1114, 1117 (2012), <u>including Ricciuti v. N.Y.C. Transit Auth.</u>, 124 F.3d 123 (2d Cir. 1997); <u>Black v. Montgomery Cnty.</u>, 835 F.3d 358, 371 (3d Cir. 2016); <u>Cole v. Carson</u>, 802 F.3d 752 (5th Cir. 2015); Mahoney v. Kesery, 976 F.2d 1054, 1061 (7th Cir. 1992) ("[A] police officer who procures a prosecution by lying to the prosecutor or to the grand

jury can be sued for the consequences of the prosecution."); <u>Jones v. City of Chicago</u>, 856 F.2d 985, 994 (7th Cir. 1988) ("[A] prosecutor's decision to charge, a grand jury's decision to indict, a prosecutor's decision not to drop charges but to proceed to trial — none of these decisions will shield a police officer who deliberately supplied misleading information that influenced the decision."); <u>Devereaux v. Abbey</u>, 263 F.3d 1070, 1075 (9th Cir. 2001); <u>Weiland v. Palm Beach Cty. Sheriff's Office</u>, 792 F.3d 1313 (11th Cir. 2015);

A fabrication of evidence claim is different from a malicious prosecution claim because probable cause is not an element. <u>Garnett v. Undercover Officer C0039</u>, 838 F.3d 265, 278 (2d Cir. 2016). Therefore, whether or not probable cause existed for an arrest is irrelevant to the claim. <u>Id.</u>; <u>Ricciuti v. N.Y.C. Transit Auth.</u>, 124 F.3d 123, 129-30 (2d Cir. 1997) (rejecting an argument that "so long as there was probable cause for Alfred Ricciuti's arrest - independent of the allegedly fabricated evidence - the fabrication of evidence is legally irrelevant"); <u>Black v. Montgomery Cnty.</u>, 835 F.3d 358, 369 (3d Cir. 2016)( we rejected the defendants' argument that claims of evidence fabrication must be tied to malicious prosecution cases).

Moreover, the majority view is that the right to be free from fabrication protects a person from initiation of criminal charges as well as conviction, so that conviction is not required to state a claim. See e.g., <u>Black v. Montgomery Cnty.</u>, 835 F.3d 358, 371 (3d Cir. 2016)( an acquitted criminal defendant may have a stand-alone fabricated evidence claim against state actors under the due process clause of the Fourteenth Amendment if there is a reasonable likelihood that, absent that fabricated evidence, the defendant would not have been criminally charged).

Others Courts of Appeals have permitted plaintiffs to pursue due process claims predicated on the fabrication of evidence notwithstanding the fact, as here, that the plaintiff was not convicted of criminal charges. <u>See, e.g., Cole v. Carson</u>, 802 F.3d 752 (5th Cir. 2015) (GVR'ed other grounds); <u>Weiland v. Palm Beach Cty. Sheriff's Office</u>, 792 F.3d 1313 (11th Cir. 2015);

<u>Zahrev v. Coffey</u>, 221 F.3d 342 (2d Cir. 2000)(acquittal); <u>Ricciuti v. N.Y.C. Transit Auth.</u>, 124 F.3d 123 (2d Cir. 1997). For instance, in <u>Cole</u>, the Court of Appeals for the Fifth Circuit recognized "a due process right not to have police deliberately fabricate evidence and use it to frame and bring false charges against a person." 802 F.3d at 771. The court noted that deliberate framing by officials "offends the most strongly held values of our nation." <u>Id.</u> at 772. Accordingly, the court determined that "even when a trial functions properly to vindicate a person's innocence," fabrication of evidence deprives a person of his or her due process rights. <u>Id.</u> at 767. The court "held that a victim of intentional fabrication of evidence by officials is denied due process <u>when he is either convicted or acquitted.</u>" <u>Id.</u> at 768 (emphasis added); <u>see also id.</u> ("[A] conviction [is] a requirement we have not insisted upon.").

The 9th Circuit has not expressly ruled in such a case but the rationale in <u>Devereaux</u> compels the conclusion and the 9th Circuit jury instructions do not make conviction an element. <u>Devereaux v. Abbey</u>, 263 F.3d 1070, 1075 (9th Cir. 2001).

This Court has recognized a fabrication of evidence claim and it has held that the right is clearly established based on the Supreme Court decisions in <u>Miller v. Pate</u>, 386 U.S. 1, 7, (1967) ("More than 30 years ago this Court held that the Fourteenth Amendment cannot tolerate a state criminal conviction obtained by the knowing use of false evidence.") and <u>Mooney v. Holohan</u>, 294 U.S. 103 (1935). <u>Gates v. District of Columbia</u>, 66 F. Supp. 3d 1, 25 (D.D.C. 2014).

## 2. The only case the District cites in opposition actually supports Mr. Fontroy's claim.

The only case the District cites in opposition to this rule is <u>Zahrev v. Coffey</u>, 221 F.3d 342 (2d Cir. 2000), where the Second Circuit held almost 20 years ago that the deprivation of his liberty without due process of law due to fabrication of evidence clearly established in 1996 even though he was acquitted. The District quotes some stray language to the effect that "fabrication" in the air without causing a deprivation of his liberty did not state a claim. But the holding of the case

is that when a prosecutor creates false information likely to influence a jury's decision, he violates the accused's constitutional right to a fair trial, and the harm occasioned by such. Similarly, <u>Ricciuti</u> in the second Circuit held that when a police officer creates false information likely to influence a jury's decision and forwards that information to prosecutors, he violates the accused's constitutional right to a fair trial, and the harm occasioned by such. <u>Ricciuti v. NYC Transit Authority</u>, 124 F.3d 123, 130 (2d Cir. 1997).

Mr. Fontroy shows that Officer Onoja's fabrication caused the same deprivation of his liberty that Plaintiff Zahrey suffered: he was detained and the government initiated a prosecution based on the fabrication that led to a period of supervised release and a trial. Docket entries, <u>United States, v. Fontroy</u>, 2015 CMD 011992, CourtView docket, Def. Ex. F.

**3. The fact that the government also detained and initiated a prosecution against Mr. Fontroy for an assault charge does not affect his claim for summary judgment, although it is relevant for damages.**

A conviction on one claim does not necessarily absolve liability under 42 U.S.C.S. § 1983 for malicious prosecution as to other criminal charges which were resolved favorably to a plaintiff. *See e.g.,* <u>Janetka v. Dabe</u>, 892 F.2d 187, 190 (2d Cir. 1989) <u>Posr v. Doherty</u>, 944 F.2d 91, 100-101 (2d Cir. 1991)(where defendant was charged and convicted of one offense and charged but acquitted of a second offense, and he sued later for malicious prosecution, the unfavorable termination on the one charge does not preclude a finding of liability for maliciously prosecuting the other charge); <u>Ostroski v. Town of Southold</u>, 443 F. Supp. 2d 325, 330 (E.D.N.Y. 2006).

A similar rule applies here because facing two charges is a greater deprivation of liberty than one. For example, where there are two charges a prosecutor can use the risk of convition on two charges as a bargaining chip to get a plea on one charge.

Also, the charges here are distinct and have different elements requiring different proof.

The cases show that the officer is liable for forwarding the false evidence to the prosecutor, effectively hijacking the prosecutor's independent judgment and causing the prosecutor to advance a case based on the fabrications. *See e.g.,* Gates v. District of Columbia, 66 F. Supp. 3d at 25. The injury occurs when the false evidence reaches the prosecutor. It doesn't matter how the evidence ultimately reaches the grand jury, the judge making a bail determination, or the petit jury, or the judge in a bench trial. As long as the prosecutor uses this false evidence in some way that causes (see above) a deprivation of liberty, there is a claim.

4. **Officer Onoja is not entitled to qualified immunity on the fabrication of evidence claim because the right was clearly established and there is remains a genuine issues of material fact regarding whether the police defendants fabricated evidence.**

Officer Onoja is not entitled to qualified immunity on the fabrication of evidence claim because the right was clearly established, and there is remains a genuine issues of material fact regarding whether the police defendants fabricated evidence. Gates, 66 F. Supp. 3d at 25-26.

Moreover, no reasonable officer could believe fabricating probable cause facts in a police report knowing the prosecutor would rely on it to make a decision whether to initiate a prosecution was reasonable. *Id.*

II. **Defendants' motion for summary judgment on Mr. Fontroy's excessive force and assault and battery claims should be denied because Officer Onoja is not entitled to qualified immunity or a common law privilege.**

A. **Officer Onoja is not entitled to qualified immunity on Mr. Fontroy's 4th Amendment excessive force claim.**

An officer's act of violence violates the Fourth Amendment if it furthers no governmental interest such as apprehending a suspect pursuant to a valid arrest or protecting an officer or the public. Johnson v. District of Columbia, 528 F.3d 969, 976 (2008). Even in excessive force cases where officers have prevailed, our Circuit has always emphasized that the violence complained of

> **Comment [SL2]:** You don't say what the genuine issue of material fact is here. I strongly suggest you do.

was undertaken in pursuit of a legitimate end. *See* Scott v. District of Columbia, 101 F.3d 748, 760 (D.C. Cir. 1996).

For example, in Scott v. District of Columbia, on which the District's relies, although the Circuit found no Fourth Amendment violation where officers struck a suspect once and pinned him to the ground, because "[a]ll of the officers' actions were reasonably calculated toward the goal of securing [the suspect] and placing him in handcuffs, while minimizing his opportunity to escape," the Court was careful to emphasize that "Nothing in the record indicates that they used more force than reasonably appeared necessary to achieve that goal." 101 F.3d 748, 760 (D.C. Cir. 1996).

In determining whether a police officer used violence in pursuit of a legitimate end a court must consider several factors, "including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." Graham v. Connor, 490 U.S. 386, 396, 109 S. Ct. 1865, 104 L. Ed. 2d 443 (1989); Mazloum v. D.C. Metro. Police Dep't, 522 F. Supp. 2d 24, 33 (D.D.C. 2007). Use of force against a person who has done nothing wrong is gratuitous because there is no legitimate purpose to sustain it. Mazloum v. D.C. Metro. Police Dep't, 522 F. Supp. 2d 24, 34-35 (D.D.C. 2007) *citing* Scott, 127 S. Ct. at 1778 (holding that it is "appropriate . . . to take into account . . . [the] relative culpability" of a plaintiff in resolving an excessive force claim); Westfahl v. D.C., 2015 U.S. Dist. LEXIS 149847, *19.

1. **The first Graham factor weighs in favor of Mr. Fontroy because Officer Onoja concedes that Mr. Fontroy had retreated so that the "severity of the crime" had diminished in importance.**

This case must be analyzed in its discrete segments. See Phelps v. Coy, 286 F.3d 295, 301 (6th Cir. 2002). The fact that Mr. Fontroy had assaulted Officer Onoja by yelling and cursing him does not justify the use of violence in this arrest because Mr. Fontroy withdrew and retreated. The

relevant segment is what happened after Mr. Fontroy retreated about 15 feet away in a submissive posture and was not resisting or attempting to flee, and twenty or more back up officers had arrived or were in sight. *See* <u>Phelps v. Coy</u>, 286 F.3d 295, 301 (6th Cir. 2002).

Once an arrestee has been incapacitated or has retreated or stopped fighting or otherwise submitted the need for force based on prior factors dissipates. <u>Arrington v. United States</u>, 473 F.3d 329, 332 (2006)(force excessive if used after appellant was subdued); <u>Slusher v. Carson</u>, 540 F.3d 449, 456 (6th Cir. 2008)(citing cases).

By the time Officer Onoja tackled Mr. Fontroy, and slammed him to the ground, Mr. Fontroy had ceased yelling at and approaching Officer Onoja. Exhibit 9 at 00:01:48 to 00:02:15. Moreover, Mr. Fontroy's had retreated about 15 feet from Officer Onoja and he was not fleeing or threatening anyone. Exhibit 9 at 00:01:48 to 00:02:15. He was standing in the street with his hands at his side. Exhibit 9 at 00:01:48 to 00:02:15.

The video shows that at 1:48 Mr. Fontroy walks across the screen moving away from Officer Onoja and Mr. Young up the street. Exhibit 9. When he comes back into the screen at 2:03 he is standing several feet away out in the street near the mouth of the driveway with his arms at his sides. *Id.* Ms. White is in the drive. Officer Onoja is past the phonebooth. *Id.*

Mr. Young said the distance from the phone booth to the edge of the store is 12- 14 feet, so at this point both Ms. White and Mr. Fontroy are at least 12 to 14 feet from Officer Onoja. Young depo. 101:10-19, Exhibit 1. Mr. Fontroy remains there until 2:14 when the first two back up officers reach Officer Onoja. Sirens are blaring signaling the imminent arrival of other officers. Exhibit 9.

The tampering charge did not justify use of force because Officer Onoja fabricated it. *See, e.g.,* <u>Mejia v. City of New York</u>, 119 F. Supp. 2d 232, 282 (E.D.N.Y. 2000) (noting that where

police officers "manufactured" evidence on which they alleged probable cause, "any use of force

would be objectively unreasonable under the circumstances.").

2. **The second Graham factor also weighs in favor of Mr. Fontroy because Officer Onoja concedes that Mr. Fontroy had retreated so that he did not pose a threat to Officer Onoja or the public, and arriving back up had neutralized any danger.**
The same facts that diminished the severity of the crime factor also showed that Mr.

Fontroy was no longer a danger to anyone. By the time Officer Onoja tackled Mr. Fontroy, and

slammed him to the ground, Mr. Fontroy had ceased yelling at and approaching Officer Onoja.

Exhibit 9 at 00:01:48 to 00:02:15. Moreover, Mr. Fontroy's had retreated about 15 feet from

Officer Onoja and he was not fleeing or threatening anyone. *Id.* He was standing in the street with

his hands at his side. *Id.*

So Mr. Fontroy was not posing a threat to Officer Onoja or anyone else at the time Officer

Onoja used violence on him. The video also confirms this fact. *Id.*

Moreover, back up had arrived before Officer Onoja tackled Mr. Fontroy and more back

up was swarming the area.

The sound of sirens and a roaring engine subsides. Exhibit 9 at 00:02:10. Back up is here!

Two back up officers arrive and walk towards Officer Onoja and Mr. Young. Exhibit 9 at 00:02:13.

20 more are about to arrive. *Id.*

But, before back officers even reach Officer Onoja and Mr. Young, Officer Onoja leaves

Mr. Young lying on the ground, jumps up, and sprints toward Mr. Fontroy even though Ms. White

is the one who threatened to kill him. Exhibit 9 at 00:02:14; Fontroy Dep. at 131:7-15, Exhibit 2.

Officer Onoja grabs Mr. Fontroy's hands and pulls his hands behind his back. Exhibit 9 at

00:02:16. Mr. Fontroy is still not resisting or trying to flee. Officer Onoja then slams him to the

sidewalk while holding his hands behind his back, and rolls him onto his face. Exhibit 9 00:02:20.

At this point two other officers are at his side. Officers are swarming the scene. Mr. Fontroy was

talking to arriving officers. Fontroy Dep. 132:7-14; 136:18-20; 142:7-8, Exhibit 2; Exhibit 9 at 00:02:14.

It is also noteworthy that Officer Onoja tackled Mr. Fontroy when it was Ms. White who threatened him. Fontroy Dep. at 131:7-15, Exhibit 2. This indicates that the "poses a danger" factor is not what motivated Officer Onoja and that the factor did not justify the violence.

Moreover, Officer Onoja could have asked some colleagues to arrest Mr. Fontroy. Similarly, he could have asked some colleagues to accompany him. "The availability of a less aggressive way of accomplishing an arrest necessarily means that the technique that was used is thereby shown to have been excessive.,,, [But] the availability of a much less aggressive technique is at least relevant to making the ultimate determination of whether excessive force was used." Brown v. City of N.Y., 798 F.3d 94, 103 (2d Cir. 2015).

As the Second Circuit held in Brown, the "assessment of a jury is needed in this case." Brown v. City of N.Y., 798 F.3d at 103. The Brown Court continued, the uncertainty "leaves the factual determination of excessiveness to a jury, whose collective common sense, informed by their life experiences, may well exceed that of all the members of this panel." *Id.*

Any justification provided by the assault evaporated after Mr. Fontroy retreated 15 feet away and remained there submissively. See Small v. McCrystal, 708 F.3d 997 (8th Cir. 2013) and Atkinson v. City of Mt. View, 709 F.3d 1201 (8th Cir. 2013); Wood v. District of Columbia, 2017 U.S. Dist. LEXIS 82876, *35 (D.D.C. May 31, 2017) (jury question on whether force necessary after arrestee stops resisting and submits to authority or is subdued).

3. **The third Graham factor weighs in favor of Mr. Fontroy because Officer Onoja concedes that when he ran to tackle Mr. Fontroy, Mr. Fontroy was not fleeing or resisting.**

Officer Onoja conceded on cross examination in Mr. Fontroy's criminal trial that Mr. Fontroy at that point was not attempting to flee, Fontroy Trial Tr. at 27, Exhibit 5, nor did he offer

any resistance whatsoever, *Id.* at, 27-28. The video also establishes that Mr. Fontroy was not resisting arrest at the time Officer Onoja used violence on him, or trying to flee. Exhibit 9.

**4. The trial court did not believe Officer Onoja's "testimony that he asked the defendant to get on the ground when it appears quite clear from the video that he was taken to the ground."**

Officer Onoja described the tackle in his trial testimony as, "I ordered him to the ground, and he went to the ground, and I placed him in handcuffs while he was on the ground." Fontroy Trial Tr. at 27-28, Exhibit 5. "I did not take him to the ground. I ordered him to get on the ground, and he was going to the ground, and he got on the ground, and I put him in handcuffs, sir." *Id.* at 28.

The trial court noted that the video contradicted Officer Onoja's testimony that Mr. Fontroy got on the ground by himself. Fontroy Trial Tr. at 50. Exhibit 5. The trial court did not believe Officer Onoja's "testimony that he asked the defendant to get on the ground when it appears quite clear from the video that he was taken to the ground." *Id.* at 50; Exhibit 9 at 00:02:25.

**5. The case, Hosea, the District cites is distinguishable.**

At the end of the incident the only remaining <u>Graham</u> factor was the fact that Mr. Fontroy had cursed and yelled at and approached Officer Onoja (but never touched him) – and then stopped. Fontroy Trial Tr. at 50-51, Exhibit 5. But, this factor is diminished because Mr. Fontroy had retreated as described above.

The District seems to be saying that there is a *per se* rule that this <u>Graham</u> factor justifies tackling Mr. Fontroy to the ground because it packs a double punch (committed offense, poses danger to another). But, "such a rule would disregard the three-factor ***balancing*** analysis that the Supreme Court required in <u>Graham</u>." <u>Brown v. City of N.Y.</u>, 798 F.3d 94, 102 (2d Cir. 2015)

> **Comment [SL3]:** I can't tell which case you mean so the judge probably can't either. Put the case title in the heading.

(emphasis added). Moreover, it disregards the fact that Mr. Fontroy had retreated and was submissive.

Hosea, the case the defendants rely on is distinguishable. Hosea v. City of St. Paul, 867 F.3d 949 (8th Cir. 2017). In Hosea, a 3 to 1 panel decision with a dissent, police responded to a home after a domestic violence call and after entering the home, broke the occupants wrist because he might have been "passively resisting" because he did not lay down as quick as the police wanted.

The panel majority ruled that the first two Graham factors were present because a reasonable officer on the scene could have concluded that Mr. Hosea had committed or was committing domestic assault—a crime that threatens the safety of another individual. Hosea v. City of St. Paul, 867 F.3d 949 (8th Cir. 2017). Moreover, the panel majority also found that the third Graham factor was present because a reasonable officer could have thought that his "initial noncompliance" – Mr. Hosea had his left knee and right hand on the ground when the officers exerted force but he had not gotten prone -- was "passive resistance." Hosea, 867 F.3d 949, *14.

 The facts in Mr. Fontroy's case are distinguishable. Before Officer Onoja used violence Mr. Fontroy's had retreated about 15 feet from Officer Onoja and he was not fleeing or threatening anyone. He was standing with his hands at his side. Back up had swarmed the area.

Mr. Fontroy had left off yelling and cursing Officer Onoja and he retreated about 15 feet away from Officer Onoja. So, not only had Mr. Fontroy stopped any aggressive behavior Mr. Fontroy was no longer within striking range as Mr. Hosea was, and he had demonstrated withdrawal and submission. An historical assault does not justify the use of force indefinitely. So, arguably Mr. Fontroy had satisfied the first two Graham factor, but, he was absolutely not posing a threat or resisting or attempting to flee.

Moreover, at this point, Officer Onoja was the aggressor. Officer Onoja sprinted over to Mr. Fontroy as back up swarmed the area. Exhibit 9 at 00:02:13. He engaged Mr. Fontroy when he had no need to, and when he was surrounded by many other officers. *Id.*

Drawing inferences in favor of Mr. Fontroy, and the absence of any present justification for the use of force, the use of force was in furtherance of Officer Onoja's desire to express dominance and his personal animus towards Mr. Fontroy, Officer Onoja's desire to clear the area, Officer Onoja's and the District's practice of keeping  certain long term residentsCertain long term residentslong term residents from the public spaces for the benefits of merchants, developers, and gentrification.

6. **Amount of force Officer Onoja used was sufficient to violate the 4th Amendment in the circumstances.**

The amount of force Officer Onoja used against Mr. Young was sufficient to violate the 4th Amendment in the circumstances. Neither the Supreme Court not our Circuit have ever held that an excessive force claim requires a certain amount of injury or a permanent injury. That is an Eighth Amendment issue. In <u>Hall</u> the Court discounted the parties' discussion in their briefs about whether the plaintiff's injuries were permanent. <u>Hall</u>, 867 F.3d 138 *46-47.

As a result of Officer Onoja's violent slam-down, Mr. Fontroy landed on concrete on his shoulder and part of his face. Fontroy Dep. 142:16-17, Exhibit 2. Immediately subsequent to the violent slam-down, Officer Onoja pulled Mr. Fontroy's arms back and cuffed him in a painful manner. Fontroy Dep. 145:10-22, Exhibit 2. Officer Onoja stated to what seemed like 30 officers arriving to the scene to "get them" referring to Ms. White and Mr. Fontroy. Fontroy Dep. 136:16-17, Exhibit 2. Officer Onoja did not take use any force in effectuating an arrest of Ms. White despite her threat but pointed at her as he told arriving officers to get them. Fontroy Dep. at 131:7-15 (Ms. White's threat); 137:1, Exhibit 2; Exhibit 9.

**7.  No reasonable officer could believe that tackling a compliant, non-fleeing Mr. Fontroy was reasonable in the circumstances.**

After Mr. Fontroy retreated and submitted the need for violence dissipated, and the use of violence became gratuitous.

Gratuitous violence is never reasonable. *See* <u>Solomon v. Auburn Hills Police Dep't</u>, 389 F.3d 167 (6th Cir. 2004) (where mother presented no danger but violated movie theater policy, it was unreasonable to kick her legs out from under her and throw her into a bookcase); <u>Adams v. Metiva</u>, 31 F.3d 375, 387 (6th Cir. 1994) (spraying mace on an incapacitated person constituted excessive force). After all, there is "simply no governmental interest" justifying gratuitous violence. *See* <u>Phelps v. Coy</u>, 286 F.3d 295, 302 (6th Cir. 2002).

In <u>Simmons</u> in deciding whether the arresting officer could have reasonably believed his actions were lawful, the Second Circuit considered the inferences raised in that case by the circumstances of the arrest that Officer Nelson (1) was upset by having been rebuffed and (2) was merely demonstrating his dominance. The court held that in light of these inferences "any pretense of reasonableness flies out the window." <u>Simpson v. City of N.Y.</u>, 793 F.3d at 269.

Here, drawing all reasonable inferences in favor of Mr. Fontroy, and weighing the Graham factors, the use of force was in furtherance of Officer Onoja's desire for pay-back and to express dominance and in furtherance of his personal animus towards Mr. Fontroy. *Id.*

**B.  Officer Onoja is not entitled to any common law defenses on the assault claim.**

A police officer is liable for battery when they commit an "intentional act that causes harmful or offensive bodily contact" and when the officer's use of such force was "in excess of that which the actor reasonably believes to be necessary." <u>Hall</u>, 867 F.3d 138 *46-47. "[T]he officer must subjectively believe that he or she used no more force than necessary, but the officer's

judgment is [also] compared to that of a hypothetical reasonable police officer placed in the same situation." Id. *citing* <u>Scales v. District of Columbia</u>, 973 A.2d 722, 730 (D.C. 2009).

It is undisputed that Officer Onoja assaulted and battered Mr. Fontroy when he slammed him to the ground. *See* <u>Etheredge v. District of Columbia</u>, 635 A.2d 908, 916 (D.C. 1993). Defendants concede this point they contend only that the assault and battery was privileged.

Under common law assault a police officer has a qualified privilege to use reasonable force to affect an arrest, but only if the means employed are not "in excess of those which the actor reasonably believes to be necessary." <u>Etheredge v. District of Columbia</u>, 635 A.2d 908, 916 (D.C. 1993).

Mr. Fontroy adopts and incorporates by reference herein the analysis and facts showing why Officer Onoja is not entitled to qualified immunity.

After he retreated Mr. Fontroy never resisted or posed a threat to Officer Onoja's safety or to the safety of any bystanders, or attempted to flee the scene. <u>Hall</u>, 867 F.3d 138 *46-47.

Therefore, the violence was not in furtherance of a police objective, so it was not reasonable. <u>Hall</u>, 867 F.3d 138 *39. Gratuitous violence is never reasonable. <u>Walters v. Stafford</u>, 317 F. App'x 479, 491 (6th Cir. 2009)

Conversely, In <u>Sinmons</u> in deciding whether the arresting officer could have reasonably believed his actions were lawful, the Second Circuit considered the inferences raised in that case by the circumstances of the arrest that Officer Nelson (1) was upset by having been rebuffed and (2) was merely demonstrating his dominance. The court held that in light of these inferences "any pretense of reasonableness flies out the window." <u>Simpson v. City of N.Y.</u>, 793 F.3d at 269.

Here, drawing all reasonable inferences in favor of Mr. Fontroy, and weighing the <u>Graham</u> factors, the use of force was in furtherance of Officer Onoja's desire for pay-back and to express dominance and in furtherance of his personal animus towards Mr. Fontroy. *Id.*

Mr. Fontroy's evidence on the assault and battery claim is sufficient to require its submission to a jury and to preclude entry of summary judgment. Etheredge v. District of Columbia, 635 A.2d 908, 917 (D.C. 1993).

### C.  There was no need for expert opinion testimony on the so-called "tactical takedown" or any other issue.

There was no need for expert opinion testimony on the so-called "tactical takedown" in this case, Def. Mot. at 7, because under Mr. Fontroy's version of the facts, there was no "tactical takedown," If by using that term defendants are suggesting that the raw violence in slamming a compliant, unresisting man to the sidewalk while holding his hands behind his back as back up swarms the area was in furtherance of a legitimate police purpose.  Plaintiff's Opposition to defendants' SMF ¶ 10. Officer Onoja grabbed Mr. Fontroy's hands from behind and slammed him to the ground  not out of necessity to protect himself or other officers but as revenge for Mr. Fontroy cursing at him.

. Officer Onoja did not perform a so-called "tactical takedown" in response to this conduct. Plaintiff's Opposition to defendants' SMF ¶¶ 10. Officer Onoja just body tackled someone who insulted him and threatened his dominance.

There is no rule in this Circuit or any other Circuit that imposes a *per se* requirement of expert testimony in excessive force and assault/ battery cases involving a police officer. This Court does not require the use of expert opinion testimony in cases such as this one when the knowledge is within the ken of a layperson.

There was no need for expert opinion testimony in this case because the means of the force was pushing someone down on the ground and that is within the knowledge of the average layperson. "Where force is reduced to its most primitive form—the bare hands—expert testimony might not be helpful." Kopf v. Skyrm, 993 F.2d 374, 378 (4th Cir.1993). In Kopf, 993 F.2d at 376, 378, a federal district court "ruled in limine that two expert witnesses [the plaintiff] expected to

call" to testify regarding the use of police dogs and slapjacks "would not be permitted to testify" because "the excessive force standard—'objective reasonableness'—is comprehensible to a lay juror and ... expert testimony would therefore not assist the trier of fact."

As the second Circuit held in Brown, the "assessment of a jury is needed in this case." Brown v. City of N.Y., 798 F.3d 94, 103. The Court continued, the uncertainty "leaves the factual determination of excessiveness to a jury, whose collective common sense, informed by their life experiences, may well exceed that of all the members of this panel." Id.

Thompson v. City of Chicago, 472 F.3d 444 (7th Cir.2006) is another example of a case in which expert testimony on the use of force was deemed not admissible. In Thompson, a police officer involved in subduing a suspect who had led officers on a high-speed automobile pursuit employed a chokehold while other officers handcuffed the suspect. (Id. at pp. 447–448.) The suspect died as a result of asphyxia due to the chokehold. (Id. at p. 448.).

Recently the Seventh Circuit stated,

Expert testimony about police standards may appropriately assist the jury in resolving some excessive-force questions, but sometimes evidence of this type is unhelpful and thus irrelevant, particularly when no specialized knowledge is needed to determine whether the officer's conduct was objectively unreasonable. The misconduct alleged here was easily within the grasp of a lay jury, so the judge did not abuse her discretion in excluding the expert.
United States v. Brown, No. 16-1603, 2017 U.S. App. LEXIS 17403, at *2 (7th Cir. Sep. 8, 2017).

The case defendants cite to was a 1991 District of Columbia Court of Appeals case which used the Frye standard instead of FRE 702 and the Daubert standard. The District of Columbia Court of Appeals did not adopt the Daubert standard until this year. Motorola Inc. v. Murray, 147 A.3d 751, 754 (D.C. 2016) (District of Columbia Court of Appeals adopts FRE 702; when a party proffers expert scientific testimony, the trial court must make "a preliminary assessment of whether

the reasoning or methodology underlying the testimony is scientifically valid and of whether that

reasoning or methodology properly can be applied to the facts in issue.").

Moreover, Mr. Fontroy does not allege negligence so he does not need an expert to establish the

standard of care. Dormu v. District of Columbia, 795 F. Supp. 2d 7, 29 (D.D.C. 2011).

### III.     The District is liable under Monell.

The District has known or should have known about Officer Onoja's open and notorious

unconstitutional conduct but the District took no steps or ineffectual steps to correct his behavior

and so the District's deliberate indifference to his violations of the rights of the people he

encounters is the moving force of those violations. Beck v. City of Pittsburgh, 89 F.3d 966, 973 (3d

Cir. 1996) (recognizing that post-event incident "may have evidentiary value for a jury's

consideration whether the City and policymakers had a pattern of tacitly approving the use of

excessive force.")

"[I]n considering whether a plaintiff has stated a claim for municipal liability, the district

court must conduct a two-step inquiry. First, the court must determine whether the complaint

states a claim for a predicate constitutional violation. Second, if so, then the court must determine

whether the complaint states a claim that a custom or policy of the municipality caused the

violation." Sheikh v. District of Columbia, 77 F. Supp. 3d 73, 84 (D.D.C. 2015) citing Baker v.

District of Columbia, 326 F.3d 1302, 1306 (D.C. Cir. 2003). Plaintiff satisfies both of these steps as

described below for all of his Constitutional claims.

### A.  Plaintiff states a claim for a predicate constitutional violation for both a fabrication of evidence and an excessive force claim.

Plaintiff states a claim for a predicate constitutional violation for both a fabrication of evidence and an excessive force claim.

### B.  Plaintiff states a Monel claim against the District.

For this claims Plaintiff pled a "deliberately indifferent" theory, that is,

> The critical question here is whether the government has failed "to respond to a need . . . in such a manner as to show 'deliberate indifference' to the risk that not addressing the need will result in constitutional violations."  The inquiry is an objective one—the factfinder must ask "whether the municipality knew or should have known of the risk of constitutional violations."

Lightfoot v. District of Columbia, 273 F.R.D. 314, 321 (D.D.C. 2011).

Cases in other Circuits support the claim. In Beck v. City of Pittsburgh, 89 F.3d 966, 973-74 (3d Cir. 1996), "the plaintiff offered in evidence a series of actual written civilian complaints of similar nature, most of them before and some after [the incident in question], containing specific information pertaining to the use of excessive force and verbal abuse by Officer Williams." The court determined that "[w]ithout more, these written complaints were sufficient for a reasonable jury to infer that the Chief of Police of Pittsburgh and his department knew, or should have known, of Officer Williams's violent behavior in arresting citizens, even when the arrestee behaved peacefully, in orderly fashion, complied with all of the Officer's demands, and offered no resistance."

Furthermore, the court "reject[ed] the district court's suggestion that mere Department procedures to receive and investigate complaints shield the City from liability. It is not enough that an investigative process be in place . . . 'The investigative process must be real. It must have some

teeth. It must answer to the citizen by providing at least a rudimentary chance of redress when injustice is done. The mere fact of investigation for the sake of investigation does not fulfill a city's obligation to its citizens.' . . . Formalism is often the last refuge of scoundrels." (quoting from appellant's brief).

Plaintiff produced detailed facts of incidents both before and after the incident in this case showing how the facts established the elements of Monel claim as follows. Plaintiff set forth the Monel facts above in the section entitled "The District Knows about Other Unconstitutional, Violent, Abusive acts of Officer Onoja and Still authorizes Him to Make Arrests and Use Force against His Fellow Citizens." Plaintiff set forth more detailed facts in plaintiff's here in in his Statement of Material Facts.

Incidents occurring both before and after the arrest and slam down of Mr. Young and the beating and fabrication of evidence claim against Mr. Fontroy support the Monel claim.

In <u>Bordanaro</u>, the First Circuit upheld the trial court's admission of post-event evidence (lack of proper internal investigation and failure to discipline officers involved) for the purpose of establishing what customs were in effect in the City before the King Arthur incident. Id. at 1166. "Post-event evidence can shed some light on what policies existed in the city on the date of an alleged deprivation of constitutional right." Id. at 1167. *Accord* <u>Beck v. City of Pittsburgh</u>, 89 F.3d 966, 973 (3d Cir. 1996) (recognizing that post-event incident "may have evidentiary value for a jury's consideration whether the City and policymakers had a pattern of tacitly approving the use of excessive force."); <u>Foley v. City of Lowell</u>, 948 F.2d 10, 13-15 (1st Cir. 1991); <u>Henry v. County of Shasta</u>, 132 F.3d 512, 518-20 (9th Cir. 1997), *amended on denial of rehearing*, 137 F.3d 1372 (9th Cir. 1998).

IV.     WHREFORE, plaintiff respectfully states that the defendants' motions for summary

judgment should be denied.

| Respectfully submitted, | Respectfully submitted, |
|---|---|
| /s/ William Claiborne<br>WILLIAM CLAIBORNE<br>D.C. Bar # 446579<br>2020 Pennsylvania Ave.,<br>N.W<br>Suite 395<br>Washington, DC 20006<br>Phone 202/824-0700<br>Email<br>claibornelaw@gmail.com | /s/ Joseph A. Scrofano<br>JOSEPH A.<br>SCROFANO<br>D.C. Bar # 994083<br>406 5th Street NW<br>Suite 100<br>Washington, DC 20001<br>Phone (202) 870-0889<br>Email<br>jas@scrofanolaw.com |